987 P.2d 996

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Clayton YIP, Defendant–Appellant**

and

**Hung Canh Ngo; Chau Van Le; King Hee Young; Mai N. Huynh, aka Nguyet Huynh Mai; Bruce Florence, Tino Ulufale, Em Van Nguyen, and Bao Van Le, Defendants.**

No. 21781.

Intermediate Court of Appeals of Hawai'i.

Sept. 23, 1999.

T. Stephen Leong, on the briefs, Honolulu, for defendant-appellant.

Caroline M. Mee, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

WATANABE, ACOBA, and LIM, JJ.

Opinion of the Court by LIM, J.

## I. Background

Defendant–Appellant Clayton Yip (Appellant) appeals the July 30, 1998 judgment of the Circuit Court of the First Circuit, convicting him of two counts of promoting gambling in the first degree, Hawai'i Revised Statutes (HRS) § 712–1221(1)(c) (1993), and sentencing him in each count to a five-year indeterminate term of imprisonment, with a mandatory minimum term without possibility of parole of one year and eight months as a repeat offender, HRS § 706–606.5, to be served concurrently. For the following reasons, we affirm.

## II. Facts

In 1994, Edwin Espinosa (Espinosa) participated in an ongoing Chinatown pepito game in his capacity as an undercover Honolulu Police Officer.

In pepito, thirteen cards are dealt to each of the four players, the "corners," who organize their cards into three poker hands of three, five, and five cards, respectively. One of the corners is designated as the "banker," and the object of the other players is to beat the banker. In general, two winning hands out of three card hands beats the opponent.

Chinese pepito, the game involved in this case, is similar except that a corner, normally a single player, could represent as many as fifteen people at a time.

After taking four per cent as a house cut, a "house bank" takes bet money from the losing corners and distributes it among the winning corners. A dealer sits across from the house bank, and neither the house bank nor the dealer plays.

On April 20–21 [1], 1994 (Count I), Espinosa visited a business located at 188 North King Street with $1200.[2] There, on a green, felt-cloth table, marked for pepito, Espinosa bet

1. There is a discrepancy between Edwin Espinosa's (Espinosa) testimony, and the indictment, as to whether the offense in Count I took place on April 19–20, 1994, or April 20–21, 1994, respectively. Appellant does not address this discrepancy on appeal, and we do not consider it. Hawaii Rules of Appellate Procedure Rule 28(b)(4).

2. Espinosa took $1200 because according to Honolulu Police Department Officer Earl Koanui's lay understanding of the law "regarding Promoting Gambling in the First Degree, ... an individual has to take over $1,000 in bets in a 7-day period." Espinosa had $1100 in violation monies and an extra $100 "[t]o pay for house cut or make any other side bets he might have to make."

and lost $1100 to co-defendant Hung Canh Ngo, one of the other players, who did not pay a house cut. At that game, co-defendant Chau Van Le (co-defendant Chau) acted as house bank, while Appellant acted as dealer.

On May 31, 1994 (Count III), Espinosa went to the same location for the same game, again with $1200, and again bet and lost $1100, this time to co-defendant Mai N. Huynh, one of the other players, who also did not pay a house cut. As in the April 20th game, co-defendant Chau acted as house bank, and Appellant acted as dealer.

The grand jury indicted Appellant on March 27, 1997, for promoting gambling in the first degree in Counts I, III, and IV of the indictment. HRS § 712–1221(1)(c). At a hearing on April 7, 1998, Appellant's motion to dismiss indictment for lack of probable cause was denied as to Counts I and III. The State acquiesced as to Count IV because testimony did not establish Appellant's participation in the July 1–2, 1994 pepito game.

Jury selection commenced on April 20, 1998. At the close of all evidence, Appellant moved for judgment of acquittal grounded in the lack of any evidence that Appellant had personally received or had due and payable more than $1000—the monetary threshold set forth in HRS § 712–1221(1)(c) for promoting gambling in the first degree, a Class C felony (as opposed to the misdemeanor promoting gambling in the second degree offense under HRS § 712–1222, which prohibits identical conduct but has no monetary threshold). The trial court denied the motion. After deliberating for less than a day, the jury returned verdicts of guilty as charged in Counts I and III.

Appellant timely filed his notice of appeal on August 6, 1998.

### III. Issues Presented

Appellant presents the following questions on appeal, quoted here verbatim:

A. *Whether the partiality of the trial judge deprived [Appellant] of his right to a fair trial?*

(1) Whether the Trial court permitted officer Koanui to testify regarding what was told him by Undercover Officer Espinosa, over [Appellant's] objection?

(2) Whether the Trial court permitted officer Koanui to testify regarding his legal opinions and conclusions over [Appellant's] objection?

(3) Whether the Trial Court incorrectly denied [Appellant] a fair trial by denying him the right to present a defense by denying his right to cross-examine witnesses by ruling that critical evidence that had a tendency to place facts before the trier of fact that [Appellant] was not an accomplice and had committed a lesser offense was irrelevant?

(4) Whether the Trial Court prevented Defense from arguing the theory of enhancement entrapment, thus depriving the jury of it's right to determine the facts of the case.

(5) Whether the Trial Court's inconsistent rulings denied [Appellant] a right to a fair trial?

B. *Whether the Trial Court erred in refusing to give defense jury instructions two and three, regarding definitions of receiving and having become due and payable and in giving instructions on "knowingly which may have confused the jury?*

C. *Whether the Motions Court abused its discretion in determining that the State had presented "looking at all the evidence presented to the grand jury for all codefendants in the light most favorable to the state finds probable cause for the prosecution to proceed on counts 1 and 3 of the indictment against [Appellant] YIP.*

D. *Whether the Trial Court erred in finding "based upon the evidence presented, giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inference of facts that a reasonable mind may fairly conclude guilt beyond a reasonable doubt" when it denied [Appellant's] motion for judg-*

*ment of acquittal at the close of all
evidence?*

(Emphases in original.)

### IV. Standards of Review

#### A. *Judicial Bias.*

■ A claim of judicial bias is reviewed de novo upon the entire record:

The charge that a trial judge denied a party a fair trial because of personal bias is a serious one. It should not be made without support. When examined against the record, Appellants' allegations that the trial judge deprived them of a fair trial because of personal bias is unsubstantiated. To the contrary, the record clearly reveals that the judge accorded both parties an eminently fair trial. We therefore reject Appellants' arguments.

*Aga v. Hundahl,* 78 Hawai'i 230, 247, 891 P.2d 1022, 1039 (1995).

■ Judicial bias in a criminal case is "structural" error, and mandates reversal, without more. *Neder v. United States,* —— U.S. ——, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

#### B. *Misapplication of Hawai'i Rules of Evidence (HRE).*

(1) Misapplication of HRE Rule 802.1(3).

■ [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.

*State v. Moore,* 82 Hawai'i 202, 217, 921 P.2d 122, 137 (1996) (citation omitted).

With respect to the [hearsay] exceptions, the only question for the trial court is "whether the specific requirements of the rule were met, [so] there can be no discretion." Thus, where the admissibility of evidence is determined by application of the hearsay rule, there can be only one correct result, and "the appropriate standard for appellate review is the right/wrong standard."

*Id.* (internal quotation marks and citation omitted).

(2) Misapplication of HRE Rule 701.

■ "In Hawai'i, admission of opinion [testimony] is a matter within the discretion of the trial court, and only an abuse of that discretion can result in reversal." *State v. Toyomura,* 80 Hawai'i 8, 23–24, 904 P.2d 893, 908–09 (1995) (internal quotation marks and citations omitted). "Generally, to constitute an abuse [of discretion,] it must appear that the [trial] court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (internal quotation marks and citation omitted).

(3) Misapplication of HRE Rules 401 and 402.

■ "Where the evidentiary ruling at issue concerns the admissibility based upon relevance, under ... [HRE] Rules 401 and 402, the proper standard of appellate review is the right/wrong standard." *State v. Bates,* 84 Hawai'i 211, 227, 933 P.2d 48, 64 (1997) (internal quotation marks and citation omitted).

#### C. *Due Process claim.*

■ "The due process guarantee of a fair trial under the fourteenth amendment to the United States Constitution and article 1, section 14, of the Hawai'i Constitution confers upon the accused in criminal proceedings 'a meaningful opportunity to present a complete defense.'" *State v. Pulse,* 83 Hawai'i 229, 246, 925 P.2d 797, 814 (1996) (internal quotation marks and citations omitted). Questions of constitutional law are reviewed under the right/wrong standard. *State v. Hanapi,* 89 Hawai'i 177, 182, 970 P.2d 485, 490 (1998), (citation omitted), *reconsideration denied* (1999).

#### D. *Jury Instructions.*

■ "When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given

are prejudicially insufficient, *erroneous*, inconsistent, or misleading." *State v. Loa*, 83 Hawai'i 335, 350, 926 P.2d 1258, 1273 (1996) (emphasis in the original).

### E. *Sufficiency of evidence before grand jury.*

 "A grand jury indictment must be based on probable cause." *State v. Ontai*, 84 Hawai'i 56, 63, 929 P.2d 69, 76 (1996) (internal quotation marks and citation omitted). "Probable cause is established by 'a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused.'" *Id.* (internal quotation marks and citation omitted).

> In reviewing the sufficiency of the evidence to establish probable cause before the grand jury, "every legitimate inference that may be drawn from the evidence must be drawn in favor of the indictment and neither the trial court nor the appellate court on review may substitute its judgment as to the weight of the evidence for [that of] the Grand Jury."

*Id.* (internal quotation marks and citation omitted). "The evidence to support an indictment need not be sufficient to support a conviction." *Id.* (internal quotation marks and citation omitted).

### F. *Judgment of Acquittal.*

 Whether a motion for judgment of acquittal has been properly denied is reviewed

> [under] the same standard that a trial court applies to such a motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt.

*State v. Jhun*, 83 Hawai'i 472, 481, 927 P.2d 1355, 1364 (1996) (internal quotation marks and citations omitted). "Sufficient evidence to support a prima facie case requires 'substantial evidence' as to every material element of the offense charged." *Id.* (internal quotation marks and citation omitted).

"Substantial evidence" ... is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.... "Under such a review, we give 'full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.'" *Id.* (internal quotation marks and citation omitted).

 "[T]he test for determining whether the trial court erred in refusing to grant a motion for judgment of acquittal is whether the evidence presented was such that a reasonable mind might fairly have concluded defendant's guilt beyond a reasonable doubt." *State v. Lee*, 75 Haw. 80, 110, 856 P.2d 1246, 1262 (1993) (internal quotation marks and citation omitted).

### V. Discussion

#### A.

Appellant prefaces his argument by asserting that he was "denied a fair trial because of judicial misconduct and/or bias." Appellant does not again refer to or explain the alternative or additional ground of judicial "misconduct." All of his other references on appeal are to judicial "partiality" or "bias".

Appellant cites as circumstantial evidence of judicial bias the following five evidentiary or jury instruction errors: (1) Permitting Officer Earl Koanui (Koanui) to testify regarding what was told him by Espinosa, (2) permitting Koanui to testify regarding his lay opinion, (3) prohibiting Appellant from cross-examining Espinosa on Espinosa's legal conclusion, (4) prohibiting Appellant from arguing the theory of enhancement entrapment, and (5) issuing inconsistent rulings.

Where "a party to any suit, action, or proceeding, civil or criminal," seeks to disqualify a judge on grounds of bias or prejudice on the part of the judge, the party must either file an affidavit, "stat[ing] the facts and reasons for the belief that bias or prejudice exists" before the trial, or provide "good cause" for failing to submit such an affidavit before trial. HRS § 601–7(b). Although Appellant failed to file an affidavit and has

not shown good cause for failing to conform with the requirement of § 601–7(b), this court is not precluded from considering his claim based on the record. *Peters v. Jamieson,* 48 Haw. 247, 263, 397 P.2d 575, 585–86 (1964).

In this case, Appellant advances no other evidence or basis for his allegation of bias, other than the five alleged trial errors. Appellant fails to explain why the judge was biased against him. A search of the entire record reveals no such bias and, indeed, the record indicates that the judge was impartial, objective, and remarkably patient throughout the proceedings.

 The Hawai'i Supreme Court has made it plain that "we have long adhered to the general rule that, standing alone, 'mere erroneous or adverse rulings by the trial judge do not spell bias or prejudice[.]'" *Aga v. Hundahl,* 78 Hawai'i 230, 242, 891 P.2d 1022, 1034 (1995) (internal quotation marks and citation omitted). "[I]n order to establish a 'personal' bias, [a defendant] must be able to show 'marked personal feelings ... on both sides inflicting lingering personal stings' on [the judge]." *Schutter v. Soong,* 76 Hawai'i 187, 205–06, 873 P.2d 66, 84–85 (1994). Under the cited precedent, Appellant's point of judicial bias must fail, even without examination of the alleged trial errors.

In any event, consideration of the five alleged trial errors reveals no prejudicial error.

(1) Whether the trial court erred in permitting Officer Koanui to testify regarding what was told him by Undercover Officer Espinosa over Appellant's objection.

 Appellant contends that the trial court erred in allowing Koanui, who supervised Espinosa in the gambling investigation, to testify that Espinosa identified Appellant as the dealer in the April 20 and May 31 pepito games. The identification occurred when Espinosa was debriefed by Koanui.

Appellant argues that Koanui's testimony was hearsay and improper lay opinion, and thus wrongly admitted at trial. With respect to the identification, Appellant's argument regarding improper lay opinion is, in substance, no different from his hearsay argument, and will be treated as such.

Appellant's hearsay argument fails because Koanui's testimony concerned prior identification under Hawai'i Rules of Evidence (HRE) Rule 802.1, which states:

> The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:
>
> . . . .
>
> (3) Prior identification. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, and the statement is one of identification of a person made after perceiving that person[.]

Koanui's testimony satisfied the requirements of HRE Rule 802.1(3). Espinosa, the declarant, testified under direct examination, and was cross-examined, as to his identifications of Appellant. Espinosa made the identifications in debriefings with Koanui after seeing Appellant dealing cards at the pepito games. *See State v. Sua,* 92 Hawai'i 78, 92–93, 987 P.2d 976, 990–991 (Haw.App.1999). So long as prior identification complies with the requirements under HRE 802.1(3), it is admissible as substantive proof of identity. *State v. Motta,* 66 Haw. 254, 262–63, 659 P.2d 745, 751 (1983).

(2) Whether the trial court erred in permitting Officer Koanui to testify regarding his legal opinions and conclusions over Appellant's objection.

 The admissibility of lay opinions is governed by HRE Rule 701, which states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Appellant contends that the trial court erred in admitting Koanui's "lay legal opinion" testimony that (1) "Espinosa was certain

of the identifications" of the defendants, and (2) the subject pepito games did not constitute social gambling.

Appellant argues that the trial court erred in admitting such testimony because it was (1) not based on personal knowledge of the witness, (2) not based upon the perceptions of the witness, and (3) not helpful to the fact finder. Grounds (1) and (2) are duplicative and will be treated as one.

The first instance involved the following exchange:

> Q [PROSECUTOR]. As to the people that Officer Espinosa did identify and specifically with respect to Mr. Ulufale and Mr. Yip, did Officer Espinosa indicate to you any uncertainty as to the his (sic) identification?
>
> A [KOANUI]. No.

There is a small but significant difference between a witness testifying directly as to another's state of mind; for example, as to certainty in his or her identifications of people; and a witness testifying that another person *manifested* no uncertainty. As to the latter, it was based upon Koanui's direct observations during his debriefings of Espinosa, and was helpful to the jury on the material element of identity; this being so, the testimony was proper lay opinion and admitting it was not error. *See State v. Tucker,* 10 Haw.App. 73, 88–93, 861 P.2d 37, 46–48, *reconsideration denied,* 78 Hawai'i 420, 9 Haw.App. 660, 894 P.2d 117, *cert. denied,* 75 Haw. 582, 863 P.2d 989, *cert. denied* 75 Haw. 582, 895 P.2d 1193 (1993) (testimony that parents accused of murdering son were not "terribly remorseful" and "exhibited no grief" when they learned of his death was helpful in determining state of mind).

 The second instance involved the following direct examination:

> Q. Officer Koanui, how long have you been investigating the allegations of illegal gambling as opposed to social gambling as a police officer?
>
> A. Well, I've been assigned to the gambling detail in 1987, since 1987, so I have eleven years to date.
>
> Q. And approximately—and I'm just looking for a ball park figure. How many such investigations have you either conducted or actively participated in?
>
> A. Easily several hundred.
>
> Q. Do you have an understanding, a lay understanding, of what the difference is between social gambling and illegal gambling based on your understanding of the Hawaii statutes?
>
> A. Yes.
>
> Q. Would you be able to explain that to us in lay terms?
>
> A. I think so.
>
> Q. If you could, please.
>
> MR. LEONG: Objection, your Honor. Same objection.
>
> THE COURT: Overruled.
>
> MS. TAMASHIRO: Same objection, your Honor, as well.
>
> A. My understanding of social gambling is it's a defense as gambling in Hawaii is illegal, period, any form of gambling. However, social gambling is a defense allowed under certain circumstances. Those circumstances are enumerated in the Hawaii Revised Statutes themselves.
>
> In order for one to invoke this privilege or this defense of social gambling, you have to make sure that all of the elements are present. In this example here, according to the debriefing that I had gotten from Officer Espinosa, he mentioned that there was a four percent house cut which is standard at such Chinatown games.
>
> Such a house cut would be in violation of the social gambling section. Also, the fact that it was being conducted in an area which is not a private residence which is a business, that would also be in violation of the social gambling section.

At trial, Appellant objected to this testimony as an improper legal conclusion. The State proffered it as lay opinion. In response, the trial judge overruled the objection without explanation and admitted the testimony. On appeal, Appellant makes an additional objection to the testimony as improper "lay legal opinion."

HRE Rule 701 limits admissible lay opinion to those opinions or inferences which are "rationally based on the perception of the witness." Though Koanui testified that he visited and observed the subject pepito game on a previous occasion during his investigation, and thus had personal knowledge of the nature of the gambling premises and the operation of the game, he expressly based his opinion, in part, on the circumstance of the house cut gleaned from his debriefing of Espinosa. This indicates that his opinion was not based solely on his personal knowledge, but in significant part upon the hearsay report of Espinosa, and was thus not admissible as lay opinion. *See American Broadcasting v. Kenai Air of Hawaii*, 67 Haw. 219, 229–30, 686 P.2d 1, 8 (1984) (mechanic, who was barred from testifying as an expert due to lack of pretrial designation as such, could not offer lay opinion as to causes of helicopter crash because he was not involved in the disassembly of the salvage and thus lacked personal knowledge).

Koanui's testimony about the social gambling defense may have been less lay opinion than expert opinion. It differs qualitatively from accepted instances of lay opinion, such as an opinion regarding a person's sobriety, *Toyomura*, 80 Hawai'i at 26–27, 904 P.2d at 911–12 (1995), or distances, *State v. Sequin*, 73 Haw. 331, 342–43, 832 P.2d 269, 275–76 (1992), or manifest emotions. *Tucker*, 10 Haw.App. at 88–93, 861 P.2d at 46–48.

Koanui's opinion, grounded in specialized police training and long experience in gambling investigations, and made upon a matter of specialized knowledge, would appear to have been expert opinion. HRE Rule 702, governing testimony by experts, states, in pertinent part:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Koanui's opinion was grounded in over eleven years of experience in the Honolulu Police Department's gambling detail and active participation in several hundred gambling cases. In connection with his duties, Koanui necessarily became familiar with the gambling statutes, and with the distinction between illegal gambling and social gambling. Koanui had observed the premises, the gambling equipment, and the pepito game in progress. His debriefing of Koanui, though hearsay, was a proper basis for expert opinion, because expert opinion can be based upon matters otherwise inadmissible. HRE Rule 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

It would appear, in addition, that a criminal investigator could reasonably rely on reports from his field operatives in forming opinions. Koanui's insight would have been helpful to the jury in determining the facts in issue. The jury was instructed on the defense of social gambling and was mandated to decide its applicability.

At first glance, it would appear Koanui's opinion regarding social gambling was admissible as an expert opinion, despite his lack of legal education or license. *Cf. State v. Schofill*, 63 Haw. 77, 83, 621 P.2d 364, 369–70 (1980) (police officer allowed to testify that what defendant gave him "appeared to be cocaine" because the officer had taken courses on drugs and cocaine, had purchased cocaine before and was familiar with its appearance).

The "legal conclusion" objection remains troubling, however, and raises the question whether Koanui's testimony about social gambling was inadmissible because it merely "told the jury what result to reach." *State v. Pinero*, 70 Haw. 509, 520–21, 778 P.2d 704, 712 (1989) (medical examiner's opinion that death was a homicide rather than an accident improperly admitted because it was not help-

ful to the trier of fact). Though "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact[,]" HRE Rule 704, to be "otherwise admissible" expert opinion must "assist the trier of fact to understand the evidence or to determine a fact in issue[.]" HRE Rule 702.

HRS § 712–1231(a), governing the social gambling defense, provides:

> (a) Definition. "Social gambling" means gambling in which all of the following conditions are present:
>
> (1) Players compete on equal terms with each other; and
>
> (2) No player receives, or becomes entitled to receive, anything of value or any profit, directly or indirectly, other than the player's personal gambling winnings; and
>
> (3) No other person, corporation, unincorporated association, or entity receives or becomes entitled to receive, anything of value or any profit, directly or indirectly, from any source, including but not limited to permitting the use of premises, supplying refreshments, food, drinks, service, lodging or entertainment; and
>
> (4) It is not conducted or played in or at a hotel, motel, bar, nightclub, cocktail lounge, restaurant, massage parlor, billiard parlor, or any business establishment of any kind, public parks, public buildings, public beaches, school grounds, churches or any other public area; and
>
> (5) None of the players is below the age of majority; and
>
> (6) The gambling activity is not bookmaking.

Koanui and Espinosa testified that the games were held at a business establishment, which implicates subsection (4). Espinosa testified that free refreshments were provided to players at the games, and that a house cut was taken, which implicate subsection (2) and (3).

If believed, this testimony, without more, would have negatived the social gambling

defense. None of this testimony was the subject of cross-examination by Appellant. Appellant offered no contrary evidence of his own on the points covered by this testimony. Being undisputed, this testimony, when considered in the light of HRS § 712–1231(a), established without question that the social gambling defense did not apply in this case. It is difficult to conceive how Koanui's testimony, which merely reiterated the evidence and reached a conclusion in the light of the statute, afforded any assistance to the jury in understanding the evidence or determining a fact in issue. Admitting Koanui's testimony concerning the social gambling defense under HRE 702 may well have been error.

In addition, to the extent that Koanui's testimony constituted a legal conclusion, it may have improperly conveyed his "unexpressed, and perhaps erroneous, legal standards to the jury," and thus may have amounted to a "usurpation of the court's responsibility to determine the applicable law and to instruct the jury as to that law." *Create 21 Chuo, Inc. v. Southwest Slopes,* 81 Hawai'i 512, 522, n. 4, 918 P.2d 1168, 1178, n. 4 (App.1996). *See, also, Pinero,* 70 Haw. at 520–21, 778 P.2d at 712.

 Even if Koanui's testimony was improper, however, the error was harmless.

First and foremost, it appears Appellant was not legally entitled to an instruction on the social gambling defense. HRS § 712–1231(b)(1) provides, in pertinent part:

> (b) Affirmative defense:
>
> (1) In any prosecution for an offense described in [section] 712–1223, 712–1224, 712–1225 or 712–1226, a defendant may assert the affirmative defense that the gambling activity in question was a social gambling game as defined in [section] 712–1231(a)."

The Commentary on § 712–1231 aids us in understanding that "casual gambling activities in a social context, ... such as casual bets between golfers or bowlers would be 'social gambling'." It is therefore consistent that HRS § 712–1231(b) does not afford the defense in prosecutions for promoting gambling in the first degree under HRS § 712–1221(1)(c), which are "aimed at large-scale

gambling[.]" Commentary On §§ 712–1221 to 1223.

Appellant suffered no prejudice by reason of Koanui's negative testimony because he simply was not entitled to the social gambling defense.

In this case, the trial court *did* instruct the jury on the social gambling defense. *See State v. Tyrrell*, 60 Haw. 17, 29, 586 P.2d 1028, 1036 (1978) ("A defendant cannot complain of an erroneous instruction which benefits him.")

■ Assuming, arguendo, that the social gambling defense applied in this case, any error in admitting Koanui's testimony was still harmless.

Any improper impact Koanui's testimony may have had was blunted by the State's qualification that he lacks a legal education, and its repeated qualification that Koanui was testifying as a layman. The proper legal authority, the trial court, accurately instructed the jury on the defense of social gambling, and it is presumed the jury followed the trial court's instructions, to consider for itself the proper elements of the social gambling defense. *State v. Melear*, 63 Haw. 488, 497, 630 P.2d 619, 626 (1981).

As noted above, Appellant presented no evidence on the defense, either by way of his own evidence or by way of cross-examination of the State's witnesses. The testimony negativing the defense remained, therefore, undisputed. Appellant did not argue the defense of social gambling, except for two casual references. Appellant did not pursue the defense, precisely because it was indefensible. The undisputed evidence showed that the pepito game included gratuities, was conducted on business˙premises and involved a house cut. Even without Koanui's opinion testimony, the jury would have had no choice other than to reject the social gambling defense.

There should be no hesitation in finding a lack of any prejudice to Appellant in the admission of Koanui's testimony regarding the social gambling defense, and in thus concluding that there is no reasonable possibility that its improper admission contributed to

Appellant's conviction. *Toyomura*, 80 Hawai'i at 27, 904 P.2d at 912.

(3) Whether the trial court deprived Appellant of a fair trial by denying him the right to present a defense by ruling that critical evidence that had a tendency to place facts before the trier of fact that Appellant was not an accomplice and had committed a lesser offense was irrelevant.

■ Appellant argues that the trial court erred, in not allowing Espinosa to testify that, in his police report, (1) he classified Appellant's offense as a misdemeanor, promoting gambling in the second degree under HRS § 712–1222, and (2) he did not describe Appellant as an accomplice. Appellant contends this was relevant testimony critical to his defense because it tended to show the true nature of his offense.

The basic thrust of Appellant's defense, is that the felony offense of promoting gambling in the first degree was charged instead of the misdemeanor offense because Espinosa "surfaced" from his undercover field work after the two-year statute of limitations had expired on Appellant's misdemeanor offense. HRS § 701–108(2)(d). Appellant theorizes that the police were after larger prey, true first degree felony offenders, and thus were willing to countenance passage of the misdemeanor statute of limitations. Appellant contends that when the State was confronted with the statute of limitations in this case, however, it concocted the accomplice liability theory in order to bootstrap an expired misdemeanor charge into a felony charge whose three-year statute of limitations had not run. HRS § 701–108(2)(d). Appellant concludes that the felony charge was trumped up by the State in a bogus attempt to salvage a defunct misdemeanor charge.

The jury was instructed on the included misdemeanor offense. Its applicability was thus an issue for the jury. The jury was also instructed on accomplice liability. Its applicability was thus also an issue for the jury. The principles and authorities that render a police officer's opinion regarding the social gambling defense an objectionable legal conclusion, *supra*, section IV(A)(2), apply with equal force to the opinions Espinosa ex-

pressed or implied in his police report. Espinosa's opinions regarding the misdemeanor offense and accomplice liability would have merely "told the jury what result to reach," *Pinèro,* 70 Haw. at 521, 778 P.2d at 712, an "usurpation of the court's responsibility to determine the applicable law and to instruct the jury as to that law." *Create 21 Chuo, Inc.,* 81 Hawai'i at 522, n. 4, 918 P.2d. at 1178, n. 4. They were legal conclusions and properly excluded.[3]

Appellant suffered little by their exclusion from the evidence. On cross-examination of Koanui, Appellant obtained admissions regarding Koanui's understanding of the felony and misdemeanor offenses, including the $1000 threshold for the felony offense; their corresponding statutes of limitations; his decision to "surface" Espinosa before expiration of the three-year felony statute of limitations; his consultations with his superior in rank and experience, and with the prosecutor, as to his investigations; and his instruction to Espinosa that he must lose more than $1000 at each game. On cross-examination of Espinosa, Appellant elicited admissions regarding the training he received from Koanui; his understanding of the felony and misdemeanor offenses, the $1000 felony threshold, and the corresponding statutes of limitations; his awareness of the theory of accomplice liability; and his conferral with Koanui regarding his police report. At Appellant's request, the trial court took judicial notice of the misdemeanor gambling offenses, promoting gambling in the second degree under HRS § 712–1222 and gambling under HRS § 712–1223.

Appellant had, therefore, all the evidentiary ingredients he needed to argue his defense theory, and he did so completely and extensively to the jury. Indeed, Appellant was able to slip Espinosa's opinion as to which offense was committed into his closing argument, without objection. It is, perhaps, understandable that Appellant would want to crown the presentation of his defense theory with a demonstration that an authority figure agreed with its ultimate conclusions. To al-

low him to do so would have been improper, and the trial court did not err in this respect.

Appellant also argues that the exclusion of Espinosa's legal conclusions from the evidence undermined his defense because he was not able to undercut the credibility of the prosecuting attorney's office. Appellant complains, in this respect, that "[a]lthough Defense did make the arguments in closing that [Espinosa] was correct and that this was a Promoting Gambling Second offense, there was no evidence in the record regarding that matter, thus undercutting counsel's credibility with the jury."

 In closing arguments, it is improper to refer to evidence which is not in the record or has been excluded by the court. *State v. Schmidt,* 84 Hawai'i 191, 201, 932 P.2d 328, 338 (App.1997). The "undercutting" complained of was self-inflicted.

(4) Whether the trial court erred in preventing Appellant from arguing the theory of enhancement entrapment, thus depriving the jury of its right to determine the facts of the case.

 Appellant argues that the trial court erred in refusing to allow him to argue the defense of enhancement entrapment. In a criminal case, a defendant "is entitled to an instruction on every defense or theory of defense having *any* support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive or unsatisfactory the evidence may be." *State v. Agrabante,* 73 Haw. 179, 196, 830 P.2d 492, 501 (1992) (internal quotation marks and citations omitted; emphasis in original).

Simple entrapment is defined under HRS § 702–237 (1993), which states:

(1) In any prosecution, it is an affirmative defense that the defendant engaged in the prohibited conduct or caused the prohibited result because the defendant was induced or encouraged to do so by a law enforcement officer, or by a person acting in cooperation with a law enforcement officer, who, for the purpose of obtaining evi-

---

**3.** To the extent Espinosa's opinions would have been elicited for impeachment purposes, exclu-

sion was harmless for the reasons stated *infra.*

dence of the commission of an offense, either:

 (a) Knowingly made false representations designed to induce the belief that such conduct or result was not prohibited; or

 (b) Employed methods of persuasion or inducement which created a substantial risk that the offense would be committed by persons other than those who are ready to commit it.

■ Appellant's theory of enhancement entrapment is also referred to as "sentencing entrapment." Sentencing entrapment occurs where "a defendant, although predisposed to commit a minor or lesser offense, is entrapped in [sic] committing a greater offense subject to greater punishment." *State v. Timas*, 82 Hawai'i 499, 515, 923 P.2d 916, 932 (App.1996) (internal quotation marks and citation omitted). This defense is typified in drug prosecutions, where law enforcement has targeted a certain quantity of drugs for purchase or sale for the express purpose of charging the greater offense. *Id.* at 514–16, 923 P.2d at 931–33. Although the Hawai'i courts have not adopted the defense of sentencing entrapment, we have recognized cases that suggest its viability: " 'Where outrageous official conduct overcomes the will of an individual predisposed only to dealing [drugs] in small quantities, this contention might bear fruit.' " *Id.* at 515, 923 P.2d at 932 (quoting *United States v. Lenfesty*, 923 F.2d 1293, 1300 (8th Cir.1991) (citation omitted)).

For purposes of discussing Appellant's points regarding enhancement entrapment, and in view of the inchoate state of Hawai'i law on this particular form of entrapment, we assume it would involve essentially the same material elements of simple entrapment, and would, by its very name, constitute an affirmative defense to the greater, rather than the lesser, offense. *Id.* at 516, 923 P.2d at 933. This appears to be Appellant's position, as well.

■ In determining the applicability of an entrapment defense, "the dispositive question is whether the action of the police ... 'was so extreme that it created a substantial risk that persons not ready to commit the offense alleged would be persuaded or induced to commit it.' " *Agrabante*, 73 Haw. at 193, 830 P.2d at 499. (internal quotation marks and citations omitted). In order to be entitled to an entrapment instruction, a defendant must produce evidence of government inducement. *Id.* at 196, 830 P.2d at 501. In considering the applicability of an entrapment defense, it is significant on the question of inducement that the defendant had no contact with the law enforcement personnel involved prior to the subject transaction. It is also germane to this question that the police do not solicit criminal activity from the general public or any other persons, other than those who actively seek out such activity. *Id.* at 194, 830 P.2d at 500.

In this case, there is no evidence that Appellant or any of his principals had any contact with Espinosa prior to the first game Espinosa attended. The record reveals no conversation between Appellant, or any of his principals, and Espinosa at the games. Indeed, the record is devoid of any indication Appellant was even aware of Espinosa, in particular. The game in which Appellant dealt cards was an ongoing game, in an established business location, and open to strangers, which Koanui learned about from another source and visited himself as part of his investigation, and which was still ongoing when he sent Espinosa to play on April 20, April 22, and May 31, 1994. The game involved doormen, a specially surfaced and marked playing table, and free food, drinks, and cigarettes supplied by the house. Anywhere from fifteen to thirty people were playing at each of the three games Espinosa attended. Wagers at those games varied from "small" bets of $100—$200, all the way up to bets of $1000. Espinosa lost more than $1000 on each of the three occasions, and apparently attracted little notice in doing so. At the games, Appellant would deal and reveal cards, collect winnings, and occasionally assist players with card organization. When Appellant was dealer, he ran the games along with the house bank. Appellant's two principals may well have been also involved in running the games, as neither of them paid a house cut on winnings.

In essence, Appellant was an important cog in a stable, organized, well-established, popular, high-stakes pepito game. Espinosa's visits were transitory and his thousand dollar losses apparently unremarkable. The record reveals no conversation or other communication between Espinosa on the one hand and Appellant or any of his principals on the other, at any time, other than the playing of the game itself. Considering the circumstances, there is absolutely no evidence of any encouragement, persuasion, or inducement on the part of Espinosa vis-a-vis Appellant or any of his principals, and thus no basis for instructing the jury on any kind of entrapment defense.

 In his arguments regarding the enhancement entrapment defense, Appellant seems most exercised by the fact that Espinosa lost more than $1000 at each of the games as part of a conscious police effort to make first degree felony cases, thus in a sense controlling the level of the offense committed. We have found, however, nothing wrong with such police tactics. *Timas* 82 Hawai'i at 514, 923 P.2d at 931 ("[W]e reject the suggestion that the courts should bar the police, when conducting sting operations, from purchasing class A felony quantities of drugs from addicts.").

(5) Whether the trial court's inconsistent rulings denied Appellant his right to a fair trial.

Appellant argues that the court ruled inconsistently, by permitting Koanui to give his legal conclusion, but excluding Espinosa's legal conclusions, which resulted in Appellant being denied a fair trial. We have considered both points, *supra*, and have found no prejudicial error. Nor have we detected therein any basis for concluding that the trial court was biased against Appellant.

## B.

Appellant's next primary complaint is that the trial court erred with respect to jury instruction, by (1) charging the jury with the Hawai'i Standard Jury Instructions Criminal (HAWJIC) definition of "knowingly," and (2) refusing Appellant's jury instructions two

and three, defining the phrase "receiving or having become due and payable."

 When jury instructions are at issue on appeal, "the instructions of the court must be read together as one connected whole, to ascertain whether they correctly declare the law … and are not inconsistent or misleading[.]" *State v. Napeahi,* 57 Haw. at 365, 377, 556 P.2d 569, 576 (internal quotation marks and citation omitted).

(1) State of mind.

 Appellant argues that, since accomplice liability requires the "intentional" state of mind, the giving of the "knowingly" definition was incorrect and misleading.

On this point, Appellant fails to recognize that accomplice liability is predicated upon the commission, by his principal, of an underlying offense:

A person is an accomplice of another person in the commission of an offense if:

(1) With the *intention* of promoting or facilitating the commission of the offense, the person:

. . . .

(b) Aids or agrees or attempts to aid the other person in planning or committing it; or

. . . .

HRS § 702–222 (emphasis added).

In this case, accomplice liability is grounded upon the principals' commission of the offense of promoting gambling in the first degree, wherein the requisite state of mind is "knowingly":

(1) A person commits the offense of promoting gambling in the first degree if the person *knowingly* advances or profits from gambling activity by:

. . . .

(c) Receiving or having become due and payable in connection with a lottery, mutuel, or other gambling scheme or enterprise, more than $1,000 in any

seven day period played in the scheme or enterprise.

HRS § 712–1221 (emphasis added.)

Therefore, as necessitated by the statutory definitions of the respective offenses, the trial court properly instructed the jury with respect to the knowing state of mind for the principal, in addition to the intentional state of mind for the accomplice. *State v. Apao*, 59 Haw. 625, 644–46, 586 P.2d 250, 262–63 (1978).

 Regardless of whether an indictment or complaint mentions accomplice or principal liability, the jury can be instructed on the law of principal and accomplice. *Id.* Addressing this issue in *Apao*, the Hawai'i Supreme Court stated, "[d]istinctions between principals and accessories have been dispensed with and a defendant may be convicted directly of an offense committed by another for whose conduct he is accountable." *Id.* at 644, 586 P.2d at 262.

Accordingly, the lack of any mention of accomplice liability in the indictment in this case did not preclude the trial court from instructing the jury as it did.

 Appellant further argues that, since he was implicated as an accomplice [4], the jury should have been instructed that it could not convict him absent evidence that he intended his principal to win Espinosa's money. Appellant avers he dealt a fair game, and so concludes that he could not have favored his principal, and thus could not have intended that his principal win.

 This argument incorrectly assumes, first, that the principal's offense is predicated upon winning at gambling. If it is contended that the offense of promoting gambling in the first degree contains a material element of winning, then mere definition requires, also, proof that the Appellant was a player in the subject game. An examination of HRS § 712–1221(1)(c) and its legislative history reveals quite clearly that neither player status nor winning is elemental in the offense.

[The] foremost obligation [in statutory construction] is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statutes themselves. Second, we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

In other words, the reason and spirit of the law, and the cause which induced the legislature to enact it, may be considered to discover its true meaning.

*State v. Markowski*, 88 Hawai'i 477, 487, 967 P.2d 674, 684 (App.1998) (internal quotation marks, citation and emphasis omitted).

HRS § 712–1221(1)(c) provides that:

(1) A person commits the offense of promoting gambling in the first degree if the person knowingly advances or profits from gambling activity by:

. . . .

(c) Receiving or having become due and payable in connection with a lottery, mutuel, or other gambling scheme or enterprise, more than $1,000 in any seven-day period played in the scheme or enterprise.

At first glance, the phrases "profits from gambling activity," "having become due and payable," and "played in the scheme or enterprise" may suggest some type of playing and winning situation.

We are warned, however, not to yield to the easy temptation of mere suggestion by the contrary circumstance of the more general words "advances" and "receiving," in the disjunctive with the phrases "profits from gambling activity" and "having become due and payable," respectively. A person may offend under this particular subsection of the statute in four distinct ways; (1) by advancing gambling activity by receiving the first-degree threshold amount of money, (2) by profiting from gambling activity by receiving that sum, (3) by advancing gambling activity by having become due and payable that sum, or (4) by profiting from gambling activity by having become due and payable that sum; the first of which, at least, bears little ine-

---

4. In Count I, the principal is Hung Canh Ngo because he was accepting bets from Espinosa; in Counts II and III, Mai N. Huynh is the principal for the same reason.

luctable suggestion of a playing and winning scenario.

We note, as well, that the prohibited receipt of money is of money "played," not won, in the gambling scheme or enterprise.

An examination of the operative words that are defined in the statutes is more instructive. "Advance gambling activity" is defined as follows:

A person "advances gambling activity" if he engages in conduct that materially aids any form of gambling activity. Conduct of this nature includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device, or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment, or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation. A person advances gambling activity if, having substantial proprietary control or other authoritative control over premises being used with his knowledge for purposes of gambling activity, he permits that activity to occur or continue or makes no effort to prevent its occurrence or continuation. A person advances gambling activity if he plays or participates in any form of gambling activity.

HRS § 712–1220(1).

The definition of "profit from gambling activity" provides: "A person 'profits from gambling activity' if he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he participates or is to participate in the proceeds of gambling activity." HRS § 712–1220(9).

Clearly, the two words defined by statute encompass a much broader range of activity than that circumscribed by playing and winning. One can "advance gambling activity" by act or omission far divorced from playing and winning; for example, by allowing, with knowledge, use of one's premises for gambling activity. One can "profit from gam-bling activity" merely by taking a cut of gambling proceeds, which may or may not include player winnings, an activity once removed from the act of playing and winning.

The reason and spirit of the law, and the impulse behind it, as revealed by legislative history, *Markowski,* 88 Hawai'i at 487–88, 967 P.2d at 684, cement the conclusion that playing and winning are mere casual incidents of the offense, and not necessary or elemental.

The legislature clearly intended an expansive definition of "advance gambling activity." It spoke of the provision's "broad scope" and characterized it as "all inclusive respecting the types of gambling activities therein described." Sen. Stand. Comm. Rep. No. 806, in 1973 Senate Journal, at 952. The legislature also explained that the broad scope of the offense encompasses activities beyond winning as a player: " '[A]dvancing' means among other things, 'conduct that materially aids any form of gambling,' and includes playing and participation." *Id.*

With respect to the activity prohibited in the disjunctive, "profits from gambling activity," the legislature expressly excluded player winnings therefrom: "[T]he definition of 'profit from gambling activity' is left unchanged. . . . This definition is intended to be all inclusive, with the exception of players' winnings." *Id.* The legislature clearly intended this alternative to cover only those profits collaterally involved in the gaming.

The conclusion is inescapable that winning is neither necessary nor elemental to the offense of promoting gambling in the first degree.

 "[T]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality." *State v. Arceo,* 84 Hawai'i 1, 19, 928 P.2d 843, 861 (1996) (citation and internal quotation marks omitted). If not absurd, then it is at least somewhat odd to contemplate a penal statute that punishes the winning gambler, while the losing gambler at his side continues on with impunity.

Appellant's argument that Appellant must have intended his principal win $1000 incor-

rectly assumes, second, that the intentional state of mind required for accomplice liability must be established, not only with respect to the material elements of HRS § 702–222, but with respect to each material element of the principal's offense as well, including the result of the principal's conduct. This proposition has no basis in the statute, and has no support in Hawai'i law.

In passing, we note *State v. Hernandez*, 61 Haw. 475, 605 P.2d 75 (1980), wherein the Defendant was convicted of kidnapping, as principal, and two counts of sexual abuse in the first degree, as accomplice, for preventing the flight of the victim in the course of his principal's attacks. In support of the convictions, the trial court found that the Defendant "certainly aided the principal Miller intentionally in my opinion beyond a reasonable doubt in the commission of whatever he wished to do with this lady, which turned out to be a beer bottle in her anus and vagina." *Id.* at 481, 605 P.2d at 79. Although this formulation clearly excludes a finding that the Defendant specifically intended the ultimate results of his principal's conduct, the supreme court detected no error and affirmed (one of the sexual abuse convictions was reversed on other grounds). *Id.* at 480–82, 605 P.2d at 78–79. *Accord, State v. Galisia*, 63 Wash.App. 833, 840, 822 P.2d 303, 307, *rev'd on other grounds* (accomplice liability in Washington is premised on the notion that a defendant need not participate in each element of the crime, nor need he share the same mental state that is required of the principal).

(2) Jury instructions.

Appellant's proposed jury instructions two and three, refused over his objection, provided as follows:

When determining whether the prosecution has proven the element of receiving more than $1000 in winnings, in any seven day period played in the scheme or enterprise in order to be prosecuted for gambling in the first degree; the police must observe the physical transfer of the money. When determining whether the prosecution has proven the element of having due and payable more than $1000 in winnings,

in any seven day period played in the scheme or enterprise in order to be prosecuted for gambling in the first degree; the police must show gambling records indicating more than $1000 is due and payable to an individual in any seven day period of a gambling scheme.

In support of these proposed instructions, Appellant relies upon, but conflates, two elements in the legislative history of HRS § 712–1221.

Hse. Stand. Comm. Rep. No. 440, involving the 1983 amendment to HRS § 712–1221(1)(c), noted enforcement problems with the unamended statute:

The purpose of this bill is to provide that a person commits the offense of promoting gambling in the first degree if he knowingly advances or profits from gambling activity by receiving or being owed a debt of more than $1,000 in any one day of money played in connection with a lottery, mutuel, or other gambling scheme or enterprise.

Under present law, a law enforcement officer must witness the physical transfer of money or property from one person to another before the case can be prosecuted. This bill will enable the officer who confiscates bookmaking records pursuant to search warrants to arrest the bookmaker whose winnings exceed $1,000 in any one day.

Hse. Stand. Comm. Rep. No. 440, in 1983 House Journal at 1036.

From the example used in the second paragraph of the report, Appellant apparently gleans the two elemental requirements, (1) a *witnessed receipt* of (2) more than $1000 in *winnings*. This misguided interpretation ignores one of the central purposes of the 1983 amendment, which was to alleviate the draconian requirement of a witnessed transaction in bookmaking cases. In focusing on the word "winnings," Appellant ignores the report's reference to "money played," and the amendment's retention of the word "receiving" in disjunction with the phrase "having become due and payable." In any event, we have extensively discussed and rejected any suggestion that "winning" is a material ele-

ment of promoting gambling in the first degree. *Supra,* section IV(A)(3).

### C.

■ Appellant contends the motions court erred in denying his motion to dismiss indictment for lack of probable cause, because there was no basis for a finding of accomplice or principal liability.

His first argument points to a lack of evidence that Appellant, a mere dealer at a card game, was working in concert with either of his actively playing principals. This argument presumes an "in concert" [5] element.

The statute's use of the disjunctive between "aids" and "agrees or attempts to aid," and between "planning" and "committing," indicates otherwise. HRS § 702–222; *Hernandez,* 61 Haw. at 481, 605 P.2d at 79. As the commentary further clarifies: "The Code avoids the vague concept of conspiracy in basing penal liability on the conduct of another, and focuses instead on the conduct of the accused which is sufficient to establish the accused's complicity." Commentary to HRS § 702–222.

Finally, the Hawai'i Supreme Court has held that an interpretation of the statute which requires a "common plan" as a material element of the offense is erroneous in light of the clear wording of the statute. *Hernandez,* 61 Haw. at 481, 605 P.2d at 79.

*Hernandez* also stands for the proposition that intent to facilitate the offense can be inferred from "acts, conduct and inferences fairly drawn from all the circumstances." *Id.* at 481–82, 605 P.2d at 79. Taking into consideration Appellant's role and conduct during the pepito games, detailed *supra,* section IV(A)(4), the evidence in the record is sufficient to establish that Defendant possessed the intent to facilitate the gambling activity.[6]

Appellant's second argument on this point on appeal is the contention that Appellant dealt a game fair to all players, thus precluding the possibility that he intended that any particular principal win $1000. This argument has been addressed and rejected. *Supra,* section IV(B)(1).

### D.

Appellant's final point on appeal, that the trial court erred in denying his motion for judgment of acquittal, is presented in a purely conclusory manner, without support in law or the record, and is without merit. It appears to repeat several aspects of his other points on appeal, considered and disposed of elsewhere herein.

### VI. *Conclusion*

Based on the foregoing, the July 20, 1998 judgment is affirmed.

---

5. A person is deemed to act in concert when he acts with another to bring about some preconceived result. *Black's Law Dictionary* at 289 (6th ed.1990).

6. Appellant was not only present at the ongoing card game, but facilitated gambling by dealing the cards, collecting money, helping other players position their cards, distributing the winnings, revealing the cards to determine the winner, and generally, "running the game."