89 P.3d 823

Peter B. CARLISLE, in his official capacity as the Prosecuting Attorney of the City and County of Honolulu, on behalf of the STATE of Hawai'i, Petitioner-Appellee,

v.

TEN THOUSAND FOUR HUNDRED FORTY–SEVEN DOLLARS IN UNITED STATES CURRENCY ($10,447.00), Defendant,

and

Matsuji Shimabuku, Interested Person–Appellant.

No. 23725.

Supreme Court of Hawai'i.

May 11, 2004.

Matsuji Shimabuku, on the briefs, interested person-appellant, pro se.

Charlotte J. Duarte, Deputy Prosecuting Attorney, on the briefs, for petitioner-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by DUFFY, J.

Interested person-appellant Matsuji Shimabuku appeals from the judgment of the first circuit court, the Honorable Michael A. Town presiding, in favor of petitioner-appellee Peter B. Carlisle (petitioner). Specifically, Shimabuku appeals from the circuit court's final judgment, filed on August · 9, 2000, granting the Verified Petition for Forfeiture (Petition) and ordering forfeiture of $3,200.00 to the State of Hawai'i (State). Based on the following, we vacate the judgment of the first circuit court insofar as it ordered the forfeiture of $3,200.00 but affirm in all other respects; we remand to the circuit court with instructions to order the forfeiture of $1,300.00 and the return of the remaining $1,900.00 to Shimabuku.

## I. BACKGROUND

The circuit court described the factual background of this case as follows:

1. The Defendant property ("subject currency") was seized for forfeiture on January 11, 1998 during the execution of a search warrant by the Honolulu Police Department ("Seizing Agency") in the City and County of Honolulu, State of Hawaii.

2. The circumstances giving rise to the seizure are as follows:

a. During the summer of 1997, HPD Detective Alexander Ahlo ("Det. Ahlo") received information from a reliable source concerning a large ongoing sports betting or bookmaking operation, and initiated an investigation.

b. During the period from September 17, 1997 through January 8, 1998, Det. Ahlo obtained evidence that one Nathan Yoshioka ("Yoshioka") was operating a large sports betting operation through his business, Pro Am Golf Shop, accepting bets on college and professional football games through wireless com-

munications to and from his cellular telephone.

c. During the investigation, on 21 separate occasions, civilians working in cooperation with HPD investigators[ ] placed more than 100 bets with Yoshioka through his cellular telephone, placing more than 5 bets totalling more than $500.00 on each occasion.

d. A court-authorized pen register and trap and trace devices were installed and utilized by HPD investigators to record telephone conversations between Yoshioka and others, including Claimant [Shimabuku], during which bets were placed and [wagers settled] with Yoshioka, and sports betting information was distributed.

e. During the hearing on the Petition, Det. Ahlo was qualified as an expert in the area of gambling and sports bookmaking.

f. Based on his participation in past investigations Det. Ahlo was aware of Claimant's past participation in gambling activities, and based on his training and experience in this area, Det. Ahlo opined that Claimant was allowed to participate as a bettor in Yoshioka's sports bookmaking scheme because Claimant had established a reputation in gambling circles for paying off his gambling debts.

g. Det. Ahlo further opined that this was significant because in this sports bookmaking scheme, bets are placed but no money is paid until after a sports activity is completed, and sports bookmaking houses only accepted wagers from persons who paid their debts.

h. If a bettor loses his/her bet, the bettor must pay the "house" or persons working for the house ("runner") the amount of the bet lost, plus a vigorish [1] equivalent to twenty percent (20%) of the total loss, and if a bettor wins, the house pays the bettor the amount of the wager placed. If multiple wagers are placed, the wagers are "settled" with the bettor or house paying the net loss or win, respectively, but in all cases, the bettor must pay the 20% vigorish on all losses.

i. Of the more than 30 persons involved in Yoshioka's sports bookmaking operation, HPD investigators were able to identify 21 individuals, including approximately 13 persons who served as runners, 2 of which [sic] participated as houses, 2 additional persons who were identified as sports bookmaking operators and/or houses, and 8 bettors including Claimant.

j. During the seven-day period from December 12 through 19, 1997, Claimant placed six (6) wagers with Yoshioka totalling $1,400.00.

k. During the seven-day period from December 20 through 27, 1997, Claimant placed nine (9) wagers with Yoshioka totalling $1,800.00.

l. In settling Claimant's won and loss wagers, Claimant suffered a net loss of $980.00 plus a 20% vigorish which he was required to pay on all lost wagers.

m. A total of ten (10) search warrants were issued and executed at the residences and/or businesses of some of the persons identified as having participated in Yoshioka's gambling scheme, including Claimant's residence, for any evidence of gambling or gambling records and paraphernalia, including items commonly used in furtherance of gambling, and United States moneys and other negotiable instruments.

n. A total of $9,997.00 of the subject currency was seized from Shimabuku's pants pockets and the remaining $450.00 of the subject currency was recovered from Shimabuku's bedroom closet shelf.

o. Claimant is married, his wife handles their finances, they have no savings or checking accounts to which Shimabuku has access, and their only source of income is their Social Security benefits.

p. Also recovered from Claimant's bedroom in close proximity to the sub-

---

1. A "vigorish" is "a charge taken (as by a bookie or gambling house) on bets[.]" *Webster's Third New International Dictionary* 2551 (1993).

ject currency were expired World Series pool tickets, sports betting devices, which although expired, constituted gambling records.

q. The subject currency was seized as property which was used or intended for use, in the commission of, attempt to commit, or conspiracy to commit the covered offenses of Promoting Gambling in the First Degree and Possession of Gambling Records in the First Degree, or which facilitated or assisted in such activity, or proceeds or other property acquired, maintained or produced by means of or as a result of the commission of those covered offenses.

3. On March 17, 1998, a *Petition for Administrative Forfeiture* was filed by the Prosecuting Attorney in A.G. No. 98–05695.

4. Claimant sought judicial review of the State's forfeiture action[,] and on May 29, 1998[ ] . . . the State filed the above-entitled Petition. . . .

On August 31, 1999, Shimabuku filed a motion to dismiss, or, in the alternative, for summary judgment. There is nothing in the record indicating that the circuit court denied the motion. However, the Petition came up for hearing before the circuit court, the Honorable Michael A. Town presiding, on April 5

and April 25, 2000, suggesting that the circuit court in fact denied Shimabuku's motion.

The circuit court concluded that the subject currency was properly seized for forfeiture.[2] The circuit court also concluded that the petitioner satisfied his burden by establishing, by a preponderance of the evidence, that the subject currency was subject to forfeiture. Furthermore, the circuit court ruled that Shimabuku did not prove by a preponderance of the evidence that the subject currency was not subject to forfeiture. However, the circuit court ruled that "[t]o avoid a result which may be disproportionate to the nature and severity of Claimant's conduct, this Court hereby limits its judgment to the forfeiture of $3,200.00 of the subject currency, a sum equivalent to the total amount that was wagered by Claimant during the period from December 12 through 27, 1997. *See H.R.S.* Section 712A–5.5."[3] The circuit court ordered that the remainder of the subject currency be returned to Shimabuku.

Shimabuku presents two principal arguments as to why he is entitled to the return of his $3,200.00. First, he argues that the search of his home was unlawful: he contends that the affidavit presented in support of the search warrant lacked sufficient information on which to base a finding of probable

**2.** The type of forfeiture that occurred in the instant case requires three steps. First, the property must be subject to forfeiture. Pursuant to HRS § 712A–4 (Supp.2003), property is subject to forfeiture for gambling offenses. Second, the property must be properly seized for forfeiture. Pursuant to HRS § 712A–6(1) (Supp.2003), property subject to forfeiture under HRS chapter 712A may be seized for forfeiture in a number of ways, including by way of a seizure warrant (as occurred in the instant case). Third, the prosecuting attorney must initiate forfeiture proceedings. HRS § 712A–10 (Supp.2003). The prosecuting attorney may bring an administrative proceeding before the attorney general, so long as the value of the seized property is less than $100,000.00; the claimant (any person claiming the property) may seek judicial review by filing a claim with the attorney general and by posting a bond (as occurred in the instant case). *Id.* In the judicial *in rem* forfeiture proceeding, "[t]he State has the initial burden of showing by a preponderance of the evidence that the claimant's interest in the property is subject to forfeiture. On such a showing by the State, the claimant has the burden of showing

by a preponderance of the evidence that the claimant's interest in the property is not subject to forfeiture." HRS § 712A–12(8) (Supp.1997).

**3.** HRS § 712A–5.5 (Supp.1997), entitled "Excessive forfeitures," provides:

The court shall limit the scope of a forfeiture judgment issued pursuant to section [712A–5(1)(b) ] to the extent the court finds the effect of the forfeiture is grossly disproportionate to the nature and severity of the owner's conduct. In determining whether a forfeiture is grossly disproportionate, the court may consider:

(1) The degree to which the property was used to facilitate the conduct that subjects property to forfeiture and the importance of the property to the conduct;

(2) The gain received or expected by an owner from the conduct that subjects property to forfeiture and the value of the property subject to forfeiture;

(3) The nature and extent of the owner's culpability; and

(4) The owner's effort to prevent the conduct or assist in prosecution.

(Brackets in original.)

cause and that the search and seizure conducted pursuant to the warrant exceeded the scope of the warrant. Second, he argues that the seizure and forfeiture of the subject currency was unlawful: he contends that the petitioner failed to prove that the subject currency was connected with gambling.[4]

## II. STANDARDS OF REVIEW

### A. Probable Cause For The Issuance Of A Search Warrant

■ This court applies *de novo* review to a magistrate's determination of probable cause for the issuance of a search warrant. *State v. Navas*, 81 Hawai'i 113, 122, 913 P.2d 39, 48 (1996). "Probable cause [to search] exists when the facts and circumstances within one's knowledge and of which one has reasonable trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed." *Id.* at 116, 913 P.2d at 42.

### B. Forfeitability Of Subject Currency

The circuit court's conclusions that the subject currency was properly seized for forfeiture and subject to forfeiture are conclusions of law subject to *de novo* review. *See Troyer v. Adams*, 102 Hawai'i 399, 409–410, 77 P.3d 83, 93–94 (2003).

### C. Summary Judgment

■ We review the circuit court's grant or denial of summary judgment *de novo*. *Hawaiì [sic] Community Federal Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing

or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* (citations and internal quotation marks omitted).

*Coon v. City and County of Honolulu*, 98 Hawai'i 233, 244–45, 47 P.3d 348, 359–60 (2002) (alteration in original).

## III. DISCUSSION

This section examines (A) Shimabuku's arguments surrounding the search of his home; (B) Shimabuku's arguments surrounding the seizure and forfeiture of the subject currency; (C) Shimabuku's contention that the circuit court erred by not granting his motion to dismiss, or, in the alternative, for summary judgment; and (D) Shimabuku's argument that he was the victim of unlawful selective enforcement.

### A. The Search Warrant Was Properly Issued And Executed, And The Defendant Currency Was Properly Seized For Forfeiture.

This section examines Shimabuku's four arguments surrounding the legality of the search of his home and seizure of the subject currency: (1) that Detective Ahlo's affidavit provided insufficient evidence to justify the circuit court's determination that probable cause existed; (2) that Detective Ahlo's affidavit was misleading; (3) that the search warrant was executed prematurely; and (4) that probable cause did not exist to seize the subject currency for forfeiture.

### 1. The affidavit contained sufficient evidence to justify the issuance of a search warrant.

■ As we have stated, "Because each police search might involve unique facts and circumstances, a determination of whether a

---

4. Shimabuku maintains that the $10,447.00 represents his and his wife's savings and was not connected to the gambling offenses with which he was charged.

search warrant complies with constitutional particularity requirements must be made 'on a case-by-case basis, taking into account all of the surrounding facts and circum-. stances.'" *State v. Anderson,* 84 Hawai'i 462, 467–68, 935 P.2d 1007, 1012–13 (1997) (quoting *State v. Kealoha,* 62 Haw. 166, 170–71, 613 P.2d 645, 648 (1980)). As noted *supra,* we review the circuit court's determination of probable cause *de novo.*

In the instant case, the circuit court issued a search warrant to obtain evidence that Shimabuku (and a number of other individuals) had committed the criminal offenses of promoting gambling in the first degree in violation of HRS § 712–1221 (1993),[5] possession of gambling records in the first degree in violation of HRS § 712–1224 (1993),[6] and criminal conspiracy in violation of HRS § 705–520 (1993).[7] The search warrant was based upon an affidavit by Detective Ahlo,[8] and this affidavit provided sufficient information to justify issuance of a search warrant.

The affidavit stated that HPD used a pen register, trap and trace devices, and surveillance (conducted between December 1997 and January 1998) to observe Shimabuku, and that Shimabuku made several telephone calls to Yoshioka and went to the Pro Am Golf Shop a number of times. Detective Ahlo's affidavit gave specific details of Shimabuku's bets and further stated that Shimabuku placed more than $1,000.00 worth of bets within a seven-day period in December 1997. Shimabuku attacks two aspects of the search warrant: (a) the reliability of the confidential informant; and (b) the sufficiency of the evidence presented to the issuing judge.

a. *The information provided by the confidential informant was reasonably trustworthy.*

Shimabuku argues that the search warrant was invalid because Detective Ahlo's affidavit failed to provide sufficient information re-

---

**5.** HRS § 712–1221 provides:

**Promoting gambling in the first degree.** (1) A person commits the offense of promoting gambling in the first degree if the person knowingly advances or profits from gambling activity by:
 (a) Engaging in bookmaking to the extent that the person receives or accepts in any seven-day period more than five bets totaling more than $500; or
 (b) Receiving in connection with a lottery, or mutuel scheme or enterprise, money or written records from a person other than a player whose chances or plays are represented by such money or records; or
 (c) Receiving or having become due and payable in connection with a lottery, mutuel, or other gambling scheme or enterprise, more than $1,000 in any seven-day period played in the scheme or enterprise.
(2) Promoting gambling in the first degree is a class C felony.
HRS § 712–1220 (1993) defines "mutuel" as "a form of lottery in which the winning chances or plays are not determined upon the basis of a drawing or other act on the part of persons conducting or connected with the scheme, but upon the basis of the outcome or outcomes of a future contingent event or events otherwise unrelated to the particular scheme."

**6.** HRS § 712–1224 provides:

**Possession of gambling records in the first degree.** (1) A person commits the offense of possession of gambling records in the first

degree if the person knowingly possesses, produces, or distributes any writing, paper, instrument, or article:
 (a) Of a kind commonly used in the operation or promotion of a bookmaking scheme or enterprise, and constituting, reflecting, or representing more than five bets totaling more than $500; or
 (b) Of a kind commonly used in the operation, promotion, or playing of a lottery or mutuel scheme or enterprise, and constituting, reflecting, or representing more than one hundred plays or chances therein or one play or chance wherein the winning amount exceeds five thousand dollars.
(2) Possession of gambling records in the first degree is a class C felony.

**7.** HRS § 705–520 provides:

**Criminal conspiracy.** A person is guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a crime:
 (1) He agrees with one or more persons that they or one or more of them will engage in or solicit the conduct or will cause or solicit the result specified by the definition of the offense; and
 (2) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

**8.** The affidavit and accompanying exhibits were sealed after the petitioner filed an *ex parte* motion for a protective order to seal these documents.

garding the confidential informant's conclusions. Shimabuku is incorrect.

■ This court has held that magistrates and judges may consider information provided by confidential informants in making probable cause determinations. As we explained in *State v. Detroy*, 102 Hawai'i 13, 18–19, 72 P.3d 485, 490–91 (2003):

> "Probable cause for [the] issuance of a search warrant may, of course, rest on reasonably trustworthy hearsay." [*State v.*] *Decano*, 60 Haw. [205,] 210, 588 P.2d [909,] 914 [(1978)]; *see also* HRPP Rule 41(c) ("The finding of probable cause may be based upon hearsay evidence in whole or in part."). But, when hearsay, such as an anonymous tip, is used to establish probable cause, this court applies the two prong test announced in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and expounded upon in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).[9] *See, generally*, *Decano*, 60 Haw. at 210, 588 P.2d at 913–14. Under this test, the affidavit must contain

> > some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the *underlying circumstances* from which the officer concluded that the informant, whose identity need not be disclosed ... was "credible" or his information "reliable."

> *State v. Davenport*, 55 Haw. 90, 93, 516 P.2d 65, 68 (1973) (quoting *Aguilar*, 378 U.S. at 114, 84 S.Ct. 1509) (emphasis added) (ellipsis points in original); *see also Spinelli*, 393 U.S. at 413, 89 S.Ct. 584. But, *"when an informer's tip is a necessary element of probable cause in a search warrant, its adequacy must turn on whether the tip alone passes the Aguilar test."*

*Davenport*, 55 Haw. at 94, 516 P.2d at 68–69 (emphasis added).... "The informer's report[, then,] must first be measured against *Aguilar's* standards so that its probative value can be assessed." *Spinelli*, 393 U.S. at 415, 89 S.Ct. 584. "If the tip [alone] is found inadequate under *Aguilar*, the other allegations which corroborate the information contained in the hearsay report should then be considered." *Id.*

(Some alterations in original and some added.) In the instant case, Detective Ahlo's affidavit satisfied both prongs of the *Aguilar* test. As to the first prong (the basis for the informant's knowledge), the affidavit stated that the informant had knowledge of the gambling operation because the informant was personally involved in the gambling operation. The informant told Detective Ahlo that Yoshioka's gambling operation involved at least ten other individuals, including Shimabuku.[10] As to the second prong (the reliability of the informant), Detective Ahlo's affidavit stated that the informant had previously provided information on a number of occasions and that on each occasion Detective Ahlo found the informant's information to be accurate through independent investigations. Given that Detective Ahlo's affidavit satisfied the two-prong test in *Aguilar*, we reject Shimabuku's argument on this point.

b. *The affidavit contained sufficient evidence.*

The affidavit provided sufficient justification for issuance of a search warrant to search for evidence that Shimabuku committed (i) gambling in the first degree, (ii) possession of gambling records in the first degree, and (iii) conspiracy. Each is examined in turn.

---

9. We continue to use the two-part *Aguilar* test, although we recognize that the United States Supreme Court has abandoned the *Aguilar* test in favor of a totality of the circumstances test. *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see also United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004) (following *Illinois v. Gates*).

10. Shimabuku argues that the informant and the affidavit demonstrate that Shimabuku acted only as a bettor, not as a "runner" or a "house," such that the informant did not provide information on the underlying circumstances giving rise to the warrant. This issue is discussed more fully in section (b), *infra*; however, the information Detective Ahlo provided about the confidential informant is sufficient to satisfy the two-prong *Aguilar* test.

### i. Promoting gambling in the first degree

Shimabuku argues that the search warrant was unlawful because it was overbroad as applied to him. Shimabuku argues that, because he was merely a bettor, there was no probable cause to believe that he had committed the offense of promoting gambling in the first degree. Shimabuku is incorrect.

█ Detective Ahlo's affidavit stated that Shimabuku had placed more than $1,000.00 in bets within a seven-day period; thus, the petitioner argued that Shimabuku violated HRS § 712–1221 by betting over $1,000.00 because, had he won the bets, he would have had over $1,000.00 "due and payable" to him as a result.[11] Shimabuku, however, argues that he did not violate HRS § 712–1221 because he *lost* money on those bets; therefore, he never had more than $1,000.00 due or payable to him within any seven-day period.

In *State v. Yip*, 92 Hawai'i 98, 987 P.2d 996 (App.1999), the Intermediate Court of Appeals (ICA) held that an individual commits the offense of promoting gambling in the first degree merely by placing more than $1,000.00 of bets, regardless of whether that individual wins those bets. The court explained:

> The conclusion is inescapable that winning is neither necessary nor elemental to the offense of promoting gambling in the first degree.
>
> "[T]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality." *State v. Arceo*, 84 Hawai'i 1, 19, 928 P.2d 843, 861 (1996) (citation and internal quotation marks omitted). If not absurd, then it is at least somewhat odd to contemplate a penal statute that punishes the winning gambler, while the losing gambler at his side continues on with impunity.

*State v. Yip*, 92 Hawai'i at 115, 987 P.2d at 1013 (alterations in original).

We decline to rule, and express no opinion, on the issue of whether an individual may violate HRS § 712–1221 merely by placing more than $1,000.00 in bets in a seven-day period. This issue is not properly before us: Shimabuku is not appealing from a conviction pursuant to HRS § 712–1221, but rather appeals from a judgment in a civil forfeiture suit.

Shimabuku argues that there was no probable cause to issue the search warrant, and we disagree. The fact that an individual places more than $1,000.00 in bets over a seven-day period provides more than a mere suspicion (albeit less than a certainty) that the individual had received or become due and payable more than $1,000.00 in a seven-day period. *See State v. Detroy*, 102 Hawai'i 13 at 18, 72 P.3d at 490 ("Probable cause exists when the facts and circumstances within one's knowledge and of which one has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed. This requires more than a mere suspicion but less than a certainty." (Internal quotation signals and citations omitted.)). Therefore, we reject Shimabuku's argument that the warrant was overbroad as applied to him because he was only a bettor.

### ii. Possession of gambling records in the first degree

█ HRS § 712–1224 provides that it is a crime to possess records "[o]f a kind commonly used in the operation *or promotion* of a bookmaking scheme or enterprise, and constituting, reflecting, or representing more than five bets totaling more than $500[.]" (Emphasis added.) Shimabuku contends that the search warrant was defective because he was never involved in *running* a betting operation, and therefore was not involved in "bookmaking." However, HRS § 712–1224 does not require that an individual operate the bookmaking scheme; the statute requires only that the individual *promote*

---

11. Again, HRS § 712–1221(1) provides that "[a] person commits the offense of promoting gambling in the first degree if the person knowingly advances or profits from gambling activity by: ... (c) Receiving or having become due and payable in connection with a lottery, mutuel, or other gambling scheme or enterprise, more than $1,000 in any seven-day period played in the scheme or enterprise."

the scheme. Detective Ahlo's affidavit stating that Shimabuku was a bettor is sufficient evidence that Shimabuku was promoting the gambling scheme. Therefore, the circuit court had sufficient evidence on which to base the search warrant for first degree possession of gambling records.

### iii. Criminal conspiracy

■ Detective Ahlo's affidavit states that Shimabuku was engaged in gambling with at least ten other individuals. As discussed *supra*, the affidavit also stated that Shimabuku was a bettor and was therefore promoting the gambling scheme. The affidavit further stated that Shimabuku intended to promote or facilitate the commission of first degree possession of gambling records by agreeing with other individuals to engage in the criminal conduct and engaging in overt acts in furtherance of the conspiracy. *See* HRS § 705–520. Therefore, the circuit court had sufficient evidence on which to base the search warrant for criminal conspiracy.

### 2. The affidavit was not misleading.

Shimabuku argues that the warrant was unlawful because Detective Ahlo's affidavit was misleading. He contends that he was only a bettor, whereas the other individuals named in the warrant were responsible for running the gambling operation; therefore, he argues, the affidavit was misleading insofar as it portrayed Shimabuku as part of a "bookmaking enterprise."

Again, Shimabuku is incorrect. As discussed *supra*, Shimabuku committed the offense of promoting gambling in the first degree even though he was only a bettor and even though he lost money as a result of his betting. Therefore, the affidavit correctly suggested that Shimabuku had committed the offense of promoting gambling in the first degree, such that the affidavit was not misleading.

### 3. The search warrant was not executed prematurely.

■ Shimabuku next argues that the warrant was void because it was executed one day before it was filed with the clerk of the court. Shimabuku is correct that the search warrant was executed on January 11, 1998, but not filed with the circuit court until January 12, 1998. However, the search warrant was signed by a judge of the first circuit court on January 10, 1998.

The fact that the warrant was not filed with the circuit court until one day after its execution is inconsequential. HRS §§ 803–31 (Supp.2003) and 803–33 (1993) require that a search warrant be signed by a judge or magistrate and be based on an affidavit that provides sufficient information to justify the warrant. The statutes do not require that a warrant be filed with the court before becoming effective. Therefore, we reject Shimabuku's argument on this point as well.

### 4. Probable cause existed to justify seizing the subject currency for forfeiture.

Shimabuku's final argument is that, even if the warrant was valid, HPD exceeded the scope of the warrant by seizing the subject currency. He argues that the only nexus between the subject currency and illegal activity is the fact that the currency was taken from his trousers (which were draped over a clothes rack in Shimabuku's bedroom) and his bedroom closet shelf, and that the subject currency was in close proximity to the expired World Series pool tickets. Shimabuku contends that he has a constitutional right to possess these expired World Series pool tickets "for souvenir purposes"; he also maintains that the warrant did not specify the money that HPD was entitled to seize. Therefore, he argues, HPD exceeded the scope of the warrant by seizing the defendant currency.

■ Shimabuku is incorrect. The search warrant specifically allowed HPD to search for and seize "United States monies and negotiable instruments related to [the] bookmaking scheme or enterprise[.]" The World Series pool tickets (although expired) were gambling records. Pursuant to HRS § 712A–6(3) (Supp.1997),[12] the proximity of

---

12. HRS § 712A–6 has since been amended, but this portion of the statute has remained un-

the subject currency to the gambling records provides probable cause for seizure: [13]

> In determining probable cause for seizure, the fact that a firearm, money, or any negotiable instrument was found in proximity to contraband or to instrumentalities of an offense gives rise to an inference that the money, or instrument was the proceeds of contraband or that the firearm, money or instrument was used or intended to be used to facilitate commission of the offense.

HPD had a warrant to search for and seize money related to gambling; the searching officers found money in close proximity to gambling records, giving rise to an inference that the money was used or was intended to be used to facilitate gambling. Therefore, the seizure was proper.[14]

■ Shimabuku maintains, however, that he has a constitutional right to possess the World Series pool tickets, and that the designation of those tickets as contraband violates the first and fourth amendments to the United States Constitution and article I, §§ 2, 5, 6, and 7 of the Hawai'i Constitution. However, Shimabuku did not raise this argument before the circuit court. Therefore, we deem this argument waived on appeal. *See Association of Apartment Owners of Wailea Elua v. Wailea Resort Co., Ltd.,* 100 Hawai'i 97, 107, 58 P.3d 608, 618 (2002) ("Legal issues not raised in the trial court are ordinarily deemed waived on appeal."). Since the World Series pool tickets were properly found to be contraband, and the subject currency was found in close proximity to that contraband, HPD had probable cause to seize the currency.

B. *The Circuit Court Correctly Ruled That Some Of The Subject Currency Was Subject To Forfeiture, But Erred In Ordering $3,200.00 Of The Subject Currency Forfeited To The State.*

Shimabuku maintains that there is no nexus between the subject currency and his

gambling activities, such that none of the subject currency is subject to forfeiture. We disagree. Based on the following, we hold that the circuit court correctly determined that some of the subject currency is subject to forfeiture. However, based on the following, we hold that the proper amount subject to forfeiture is $1,300.00.

**1. Shimabuku's arguments**

Shimabuku notes that "[m]oney is inherently legal, and is not contraband unless used in an unlawful manner." *Awaya v. State,* 5 Haw.App. 547, 555, 705 P.2d 54, 61 (1985). He then states that the subject currency is not subject to forfeiture unless the petitioner proves, by a preponderance of the evidence, that the subject currency was used for illegal gambling. Shimabuku argues that the petitioner did not prove the existence of any nexus between the subject currency and Shimabuku's illegal gambling; specifically, because he lost money between December 12 and 27, 1997, the subject currency could not have been proceeds of illegal gambling activities.

**2. The petitioner's arguments**

The petitioner argues that he proved, by a preponderance of the evidence, that the subject currency was subject to forfeiture. He points to HRS § 712–1230 (1993), entitled "Forfeiture of property used in illegal gambling," which provides:

> Any gambling device, paraphernalia used on fighting animals, or birds, implements, furniture, personal property, vehicles, vessels, aircraft, or gambling record possessed or used in violation of this part, *or any money or personal property used as a bet or stake in gambling activity in violation of this part,* may be ordered forfeited to

changed.. *See* HRS § 712A–6 (Supp.2003).

**13.** HRS § 712A–6(3) allows for this inference when determining whether currency is subject to *seizure;* it does not provide that the currency is subject to *forfeiture* simply because of its proximity to contraband.

**14.** *Cf. Kaneshiro v. $19,050.00 in United States Currency,* 73 Haw. 229, 235, 832 P.2d 256, 259 (1992) (holding that probable cause did not exist to seize the defendant currency where the State did not produce sufficient evidence to prove that "a covered offense had been committed or even attempted").

the State, subject to the requirements of chapter 712A.

(Emphasis added.) Additionally, the petitioner points to HRS § 712A–5 (1993 & Supp.2003),[15] which describes property subject to forfeiture and includes:

(a) Property described in a statute authorizing forfeiture;

(b) Property used or intended for use in the commission of, attempt to commit, or conspiracy to commit a covered offense, *or which facilitated or assisted such activity;*

. . . .

(e) Any proceeds or other property acquired, maintained, or produced by means of or as a result of the commission of the covered offense[.]

(Emphasis added.)

The circuit court heard evidence from Detective Ahlo (who was qualified as an expert in the area of gambling and sports bookmaking,) that gamblers often carry large sums of cash to facilitate their gambling activities. Detective Ahlo testified that finding over $10,000.00 in Shimabuku's trousers was therefore not unusual. The circuit court also heard evidence that the Shimabukus' only source of income was Social Security benefits. Shimabuku testified that he signed his checks over to his wife and that his wife deposited the checks in the bank. He further testified that his wife handled their finances and Shimabuku did not have access to any bank accounts (including the bank account in which his wife deposited the Social Security checks). The petitioner maintains that, because Yoshioka accepted bets from Shimabuku, Shimabuku must have paid his gambling debts to Yoshioka; since Shimabu-

ku did not have access to any other funds, he must have used the money in his trousers to facilitate his gambling activities. Therefore, the petitioner argues that he proved, by a preponderance of the evidence, that the subject currency was subject to forfeiture because the subject currency facilitated Shimabuku's illegal gambling activities.

### 3. Analysis

#### a. *Statutory language*

There are five statutes that govern our analysis in the instant case. First, HRS § 712A–5(1)(e) provides that the petitioner may seek forfeiture of gambling proceeds; second, HRS § 712A–5(1)(b) provides that the petitioner may seek forfeiture of property that facilitates illegal gambling activity; third, HRS § 712–1230 allows for forfeiture of property used as a bet or stake in illegal gambling activity; fourth, HRS § 712A–5.5 *requires* a court to limit the scope of forfeitures under HRS § 712A–5(1)(b) (allowing for forfeiture of property facilitating illegal gambling) to prevent grossly disproportionate forfeitures;[16] and fifth, HRS § 712A–11(4) provides that "[a] finding that property is the proceeds of criminal conduct giving rise to forfeiture does not require proof that the property is the proceeds [of] any particular exchange or transaction."[17] (Second set of brackets in original.) An *in pari materia* reading of these five statutes clearly shows that the legislature intended to prevent individuals like Shimabuku from profiting from their illegal gambling activities. *See* HRS § 1–16 (1993) ("Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is

---

**15.** Portions of this statute have been amended since 1997, but the sections quoted herein have remained unchanged since the statute was enacted in 1988. *See* 1988 Haw. Sess. L. Act 260, § 1 at 459.

**16.** HRS § 712A–5.5 does *not* require that a court avoid grossly disproportionate results in forfeiting proceeds of illegal activity. However, neither HRS § 712A–5(1)(b), HRS § 712A–5(1)(e), nor HRS § 712–1230 requires that proceeds be ordered forfeited: HRS § 712A–5(1)(e) provides only that proceeds of illegal gambling activities are *subject* to forfeiture. Therefore, once the

circuit court determines that property is subject to forfeiture (a conclusion of law subject to *de novo* review), the circuit court has discretion as to whether to order that property forfeited to the State (a determination subject to abuse of discretion review).

**17.** By its terms, however, HRS § 712A–11(4) applies only to "proceeds of criminal conduct." HRS § 712A–11(4), therefore, does not apply to money that facilitated the illegal gambling activity (HRS § 712A–5(1)(b)) or to money used as a bet or stake (HRS § 712–1230).

clear in one statute may be called in aid to explain what is doubtful in another.").[18]

These five statutes do not, however, clearly set forth the method by which to calculate the precise amount to be forfeited to the State. For example, although the legislature provided a broad definition of "proceeds,"[19] the legislature did not specify how this court should measure proceeds. In the instant case, Shimabuku lost a total of $980.00 between December 12 and 27, 1997, suggesting he had no proceeds. However, this calculation ignores the fact that Shimabuku won several of his bets,[20] such that if this court were to look at individual bets or individual telephone calls made to Yoshioka, Shimabuku did have proceeds from his gambling activities. Therefore, depending on the time frame used by a reviewing court, the amount

subject to forfeiture could change significantly. Similarly, the legislature did not indicate how a reviewing court should determine the sum that facilitated the illegal gambling activity. Although the entire $10,447.00 arguably "facilitated" Shimabuku's gambling activities in an abstract sense, there was no evidence to tie the entire sum to his gambling.[21] Additionally, Shimabuku lost money on many of his bets and paid Yoshioka for his losses; therefore, the money that facilitated those transactions is arguably no longer a part of the subject currency. Again, the legislature did not detail the way in which a reviewing court should balance these factors.

b. *Legislative history*

■ As we have stated, "If the statutory language is ambiguous or doubt exists as to

18. A sixth statute is also relevant here. HRS § 712A–11(3) (1993) provides for a rebuttable presumption of forfeitability if the State satisfies the following three-factor test:
(a) That the person has engaged in criminal conduct for which property is subject to forfeiture;
(b) That the property was acquired by the person during the period of the criminal conduct or within a reasonable time after that period; and
(c) That there was no likely source for the property other than the criminal conduct giving rise to forfeiture.
The subject currency does not satisfy this three-factor test because the petitioner did not show that the subject currency was acquired by Shimabuku during the period in which the surveillance took place; therefore, Shimabuku argues, the subject currency is not subject to forfeiture. We disagree. HRS § 712A–11(3) only provides for forfeiture of property *acquired* during the period of criminal activity. However, HRS § 712A–5(1)(b) (allowing for forfeiture of property that facilitated illegal activity) and HRS § 712–1230 (allowing for forfeiture of property used as a bet or stake) contemplate something broader than forfeiture of property acquired through illegal activity. Therefore, if HRS § 712A–11(3)'s three-part test were the only method by which the State could prove forfeitability, then HRS §§ 712A–5(1)(b) and 712–1230 would be essentially nullified. We do not believe the legislature intended this result; instead, we believe that HRS § 712A–11(3) provides one method by which the State can prove that defendant property is subject to forfeiture. The State may still prove that defendant property is subject to forfeiture by proving, by a preponderance of the evidence, that the property is the proceeds of illegal activity, facilitated illegal activity, or was used as a bet or stake in illegal gambling activity.

19. HRS § 712A–1 (1993 & Supp.2003) defines proceeds as "anything of value, derived directly or indirectly from or realized through unlawful activity." The definition of "proceeds" has remained unchanged since this statute was enacted in 1988. *See* 1988 Haw. Sess. L. Act 260, § 1 at 458.

20. The circuit court did not specifically find that Shimabuku had proceeds. The circuit court found that Shimabuku placed $3,200.00 in bets and lost $980.00 as a result of these bets; in so finding, the circuit court necessarily relied upon Detective Ahlo's testimony and the petitioner's exhibits. This testimony and these exhibits set forth each of Shimabuku's bets, including the date and time the bet was placed, the amount wagered, and the amount won or lost. Shimabuku lost on $1,900.00 in bets, requiring him to pay Yoshioka $2,280.00 ($1,900.00 plus a 20% vigorish). Shimabuku won on the remaining $1,300.00 in bets, leaving him with a net loss of $980.00.

21. *See also State v. Nobuhara*, 52 Haw. 319, 474 P.2d 707 (1970), in which this court held that money seized from defendants was not subject to forfeiture. The defendants had been arrested for betting on an athletic contest; at the time of their arrest, the police seized over $15,000.00 in cash from the defendants. *Id.* at 319–20, 474 P.2d at 708. The defendants conceded that evidence introduced at trial justified the forfeiture of $2,240.00. *Id.* at 320, 474 P.2d at 708. However, we held that the remaining money was not subject to forfeiture because "the prosecution adduced absolutely no evidence to tie in the [remaining] moneys ... with their betting activities." *Id.*

its meaning, courts may take legislative history into consideration in construing a statute." *Franks v. City and County of Honolulu*, 74 Haw. 328, 335, 843 P.2d 668, 671–72 (1993) (citations, internal quotation signals, and brackets omitted).

The legislative history of HRS chapter 712A provides some insight as to how we should calculate the proper amount to be forfeited to the State. In discussing the bill enacting HRS chapter 712A, the House Judiciary Committee stated that "[t]he purpose of this bill is to authorize the forfeiture of property used in the furtherance of specified offenses *and to thereby deprive criminals of the profits of criminal activities.*" Hse. Stand. Comm. Rep. No. 2–88, in 1988 House Journal, at 849. In amending HRS chapter 712A, the House Judiciary Committee stated that "[i]f property were the proceeds of an offense or derivatives of an offense, all of the property would be tainted and thus be forfeited." Hse. Stand. Comm. Rep. No. 409–96, in 1996 House Journal, at 1192. HRS chapter 712A, therefore, is designed to ensure that the economic benefits of committing a crime do not outweigh the consequential criminal penalties; otherwise, without the forfeiture statute, an individual might determine that the money gained from gambling activities outweighs the costs associated with criminal convictions.

c. *Application to the instant case*

 Given that this is an *in rem* judicial forfeiture proceeding, the State must prove

that the defendant—the subject currency, not Shimabuku—was connected to illegal activity.[22] *See, e.g., State v. Tuipuapua*, 83 Hawai'i 141, 152, 925 P.2d 311, 322 (1996) ("[T]here is no requirement in HRS chapter 712A that the state demonstrate scienter in order to establish that the property is subject to forfeiture; indeed, the property may be subject to forfeiture even if no party files a claim to it and the prosecution never shows any connection between the property and a particular person."); *United States v. One Hundred and Thirty–Four Thousand, Seven Hundred and Fifty–Two Dollars United States Currency, More or Less,* 706 F.Supp. 1075, 1083 (S.D.N.Y.1989) ("[T]he legally relevant question is not whether [the interested person] may have participated in illegal activity, but whether there is evidence linking the *res* to [illegal activity.]"). The legislature has not set forth the standard by which we are to measure the connection between the facilitating property and the illegal activity.[23] However, the *in rem* nature of this proceeding mandates that there be at least *some* connection between the subject currency and illegal activity. For example, in *Riley v. 1987 Station Wagon,* 650 N.W.2d 441 (Minn.2002), the Minnesota Supreme Court considered the forfeitability of an automobile allegedly used to "facilitate" a conspiracy to commit murder:

"[C]ommon sense dictates that the law require a substantially significant connection with criminal activity before an ordinary automobile may be seized and forfeited to the Government." *United States v. One*

---

**22.** The record on appeal does not contain information on the outcome of the prior criminal proceedings against Shimabuku.

**23.** The Civil Asset Forfeiture Reform Act of 2000 (CAFRA), 21 U.S.C. § 881, provides for forfeiture of property used in facilitating illegal narcotics transactions. Some federal courts have held that the United States must prove the existence of a "substantial connection" between the prohibited activity and the facilitating property, *see, e.g., United States v. Cleckler,* 270 F.3d 1331, 1333–34 (11th Cir.2001) ("In a civil forfeiture action under section 881(a)(7), the government must establish probable cause to believe that a substantial connection exists between the defendant-property and an illegal exchange of a controlled substance."), while other federal courts have held only that there be a "sufficient nexus" between the two, *see United States v. One 1974*

*Cadillac Eldorado Vin: 6L47S40431975,* 575 F.2d 344, 345 (2d Cir.1978) ("[W]e find an insufficient nexus between the Cadillac and the drug transaction to warrant forfeiture[.]"); however, there may be no difference between these two standards, *see United States v. One Parcel of Real Estate Commonly Known as 916 Douglas Ave., Elgin, Ill.,* 903 F.2d 490, 494 (7th Cir.1990) (applying the "sufficient nexus" test and stating that "although the Fourth Circuit has adopted a 'substantial connection' test, the differences between this approach and our own appear largely to be semantic rather than practical."). *See also* David B. Smith, *Prosecution and Defense of Forfeiture Cases* § 3.03, at 3–12 (2003); United States Department of Justice, *Asset Forfeiture Law and Practice Manual* 1–6 to 1–7 (3d ed.1998).

*1972 Datsun[,] Vehicle Identification No. LB1100355950,* 378 F.Supp. 1200, 1206 (D.N.H.1974). The reason is that the use of the automobile in our society is pervasive. *Id.* A car by itself is not contraband and there is little activity that the use of a car does not "facilitate" to some degree. *Id.* With respect to vehicular conveyances, we hold that the term "facilitate," as used in section 609.5312, subdivision 1,[24] requires a direct and substantial connection between the vehicle being forfeited and the designated offense.

*Riley,* 650 N.W.2d at 445. We believe that this analysis applies equally to forfeitures of currency, and therefore hold that the State must prove the existence of a substantial connection between the currency being forfeited and the illegal activity.[25]

■■■■ In the instant case, $1,300.00 of the subject currency is substantially connected to Shimabuku's illegal gambling activity. Shimabuku obtained $1,300.00 in proceeds between December 12 and 27, 1997, and HRS § 712A–11(4) provides that the State need

not trace the proceeds exactly; in other words, the State need not prove that $1,300.00 of the subject currency is the same $1,300.00 gained as proceeds.[26] Therefore, $1,300.00 was properly ordered forfeited to the State.[27]

■■■■ However, we also hold that the circuit court erred in ordering the remaining $1,900.00 forfeited to the State. Although the existence of a large amount of currency in close proximity to gambling records implies that the currency facilitated illegal activity, the petitioner did not prove, by a preponderance of the evidence, that the *subject currency* seized from Shimabuku's trousers was involved in Shimabuku's gambling transactions. Shimabuku certainly must have had some currency which facilitated his gambling activities; however, there is no evidence connecting this particular bundle of currency to any illegal activity. Absent proof of a substantial connection between the illegal activity and the *res,* the currency is not subject to forfeiture.[28]

24. Minn.Stat. § 609.5312, subd. 1 (2003), provides:

> All personal property is subject to forfeiture if it was used or intended for use to commit or facilitate the commission of a designated offense. All money and other property, real and personal, that represent proceeds of a designated offense, and all contraband property, are subject to forfeiture, except as provided in this section.

25. We also agree with the Seventh Circuit Court of Appeals and the Minnesota Supreme Court that the substantial connection test and the sufficient nexus test are functionally equivalent. *See One Parcel of Real Estate Commonly Known as 916 Douglas Ave.,* 903 F.2d at 494; *Miller v. One 2001 Pontiac Aztek,* 669 N.W.2d 893, 896 (Minn. 2003) (discussing *Riley* and using the phrases "substantially significant connection" and "sufficient nexus" interchangeably).

26. In analyzing Shimabuku's gambling activities, the circuit court appears to have treated Shimabuku's wagers as a series of individual, discrete gambling transactions; this is evidenced by the fact that the circuit court aggregated Shimabuku's wagers, ordering forfeiture of "$3,200.00 of the subject currency, a sum equivalent to the total amount that was wagered by Claimant during the period from December 12 through 27, 1997." However, the circuit court could have used a different time frame in which to analyze Shimabuku's gambling activities: the circuit court could have treated Shimabuku's gambling

as one continuous gambling transaction, with zero proceeds (and in fact a net loss of $980.00). Given the breadth of gambling activities the lower courts are likely to encounter, we leave the circuit courts with discretion to determine the time frame in which to analyze proceeds. Shimabuku's gambling took place over the course of nine days (with the first recorded wager placed on December 13, 1997 and the last recorded wager placed on December 21, 1997); therefore, we do not believe that the circuit court abused its discretion in treating Shimabuku's wagers as distinct transactions.

27. A remand for a factual determination is unnecessary in the instant case. The calculation of $1,300.00 in proceeds is implicit in the circuit court's findings, such that another factual hearing is unnecessary.

28. As one federal district court stated:

> [W]hile evidence in this case gives rise to a strong suspicion, perhaps even probable cause, to believe the *res* played some role in *some* illegal activity, it does not give rise to a reasonable belief, supported by more than mere suspicion, that the *res* was in fact used in violation of the relevant forfeiture statute. If I reached the opposite result, any person with a history of illegal gambling activity could have his property seized by the government any time that property was discovered in suspicious circumstances implicating any sort of illegal ac-

C. *The Circuit Court Did Not Err In Refusing To Grant Shimabuku's Motion To Dismiss, Or, In The Alternative, Motion For Summary Judgment.*

■ Shimabuku argues that the circuit court abused its discretion in failing to rule on his motion to dismiss, or, in the alternative, motion for summary judgment. However, Shimabuku did not raise this argument before the circuit court. Therefore, we deem this argument waived on appeal. *See Association of Apartment Owners of Wailea Elua*, 100 Hawai'i 97, 107, 58 P.3d 608, 618 (2002).

Shimabuku also argues that the circuit court should have granted his motion to dismiss, or, in the alternative, motion for summary judgment. However, based on the discussion in sections A and B, *supra*, we hold that the circuit court was correct in concluding that Shimabuku was not entitled to judgment as a matter of law.

D. *Shimabuku Is Not The Victim Of Selective Enforcement.*

■ Shimabuku's final argument is that the search warrant violated his rights under the fourteenth amendment to the United States Constitution and Article I, § 5 of the Hawai'i Constitution because a search warrant was issued against him but was not issued against any other bettors. Shimabuku notes that Detective Ahlo identified eight bettors in the gambling ring but that a search warrant was not issued against the other seven bettors.

Shimabuku points to *State v. Kailua Auto Wreckers, Inc.*, 62 Haw. 222, 226–27, 615 P.2d 730, 734–35 (1980), in support of his claim of discriminatory enforcement. In *Kailua Auto Wreckers*, this court held:

> The burden of proving discriminatory enforcement of the law rests upon the party raising the defense. That party must present sufficient evidence to establish the existence of intentional or purposeful discrimination that is "deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classifica-

> tion." It is insufficient to show merely that other offenders have not been prosecuted; or that there has been laxity of enforcement; or that there has been some conscious selectivity in prosecution. Recognition of the defense will not permit the guilty to go free simply by showing that other violators exist. However, where a defendant proves that there is no legitimate basis for a law's selective enforcement, the prosecutor's conduct will be subjected to the court's scrutiny.

*Id.* at 226–27, 615 P.2d at 734–35 (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)) (citations and footnotes omitted). Shimabuku claims that Detective Ahlo arbitrarily "classified" Shimabuku as part of a conspiracy based on his (Detective Ahlo's) belief that betting makes the bettor guilty of conspiracy to commit gambling in the first degree. However, this is not the type of "arbitrary classification" that we had in mind when we referred to " 'an unjustifiable standard such as race, religion or other arbitrary classification.' " *Kailua Auto Wreckers*, 62 Haw. at 227, 615 P.2d at 734.

Furthermore, even if Shimabuku is correct that Detective Ahlo improperly classified Shimabuku, this does not explain why only Shimabuku—and not the seven other bettors— was subjected to a search warrant. To raise the selective prosecution defense, Shimabuku must present sufficient evidence as to why he was prosecuted while the other seven bettors were not. The reason provided by Shimabuku does not distinguish him from the other bettors; rather, it would seem to provide a reason why all eight should have been prosecuted. Therefore, we reject this argument as well.

IV. *CONCLUSION*

Based on the foregoing, we vacate the August 9, 2000 judgment of the circuit court and remand with instructions to order the forfeiture of $1,300.00 of the subject currency

---

tivity. Such a result is without basis in the in law and would put at risk fundamental constitutional guarantees against unreasonable seizures.

*United States v. One Hundred and Thirty–Four Thousand, Seven Hundred and Fifty–Two Dollars United States Currency, More or Less*, 706 F.Supp. 1075, 1086 (S.D.N.Y.1989).

to the State and the return of the remaining
$1,900.00 to Shimabuku.